UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

___

CLIFFORD JAMES BOLAND,

        Plaintiff,

       v.                                      Case No. 24-cv-0352-scd

DANIEL LAVOIE et al.,

        Defendants.

___

**DECISION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

___

      Plaintiff Clifford James Boland, who is incarcerated at Stanley Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on claims based on allegations that he was denied adequate treatment for a serious medical condition. On May 30, 2025, Defendants moved for summary judgment. For the reasons explained below, the Court will grant the motion and dismiss this case.

## BACKGROUND

      At the relevant time, Boland was incarcerated at Stanley Correctional Institution, where Defendant Jamie Barker worked as the health services manager. Also at that time, Defendant Dr. Daniel LaVoie worked as the medical director for the Department of Corrections Bureau of Health Services. Boland has a history of prostate cancer with a prior prostatectomy in 2018. In 2020, Boland underwent adjunctive external beam pelvic radiotherapy. While radiation therapy is a well-established treatment for many types of cancer, it may acutely injure normal tissue in the path of the radiation. This acute injury usually heals on its own, but a relatively rare complication of radiotherapy may develop months or even years after the treatment is completed. A type of late

radiation tissue injury is radiation cystitis, which is the inflammation of the lining of the bladder. Symptoms of radiation cystitis include pain and burning while urinating (dysuria), blood in the urine (hematuria), feeling an urgent or persistent need to urinate, being unable to control the flow of urine, bladder spasms, and pain in the pelvis. Dkt. No. 60 at ¶¶33-37, 42.

On February 7, 2023, Boland was seen via televisit by Dr. Josiah Nelson. Boland reported blood in his urine, but he stated it not currently an issue. Dr. Nelson suspected radiation cystitis and recommended hydrocodone-acetaminophen as needed, pads for urgency, and a follow-up appointment in six months. He also raised hyperbaric oxygen therapy as a possible treatment. Hyperbaric oxygen therapy involves placing a patient in an airtight vessel, increasing the pressure within the vessel, and giving 100% oxygen. The intent is to deliver a greatly increased partial pressure of oxygen to the tissue with the hopes of improving tissue quality, promoting healing, and preventing breakdown of irradiated fields. Hyperbaric oxygen therapy is a generally safe treatment, although there are some risks of adverse effects. Boland declined to pursue hyperbaric oxygen therapy at that time. Dkt. No. 60 at ¶¶38-43.

About a week later, on February 14, 2023, Boland reported to the health services unit with complaints of blood in his urine and a sharp pain in his bladder. He was seen a week later by his assigned advanced care provider. Boland informed him that, because he continued to have bloody urine, he would like to pursue hyperbaric oxygen therapy. A few weeks later, on March 7, 2023, Boland was seen again via televisit by Dr. Nelson, who recommended hyperbaric oxygen therapy to treat Boland's radiation cystitis. Dkt. No. 60 at ¶¶43-45.

A little less than a month later, on April 4, 2023, Barker followed up with the advanced care provider regarding Dr. Nelson's recommendation. The advanced care provider informed Barker that he would review and address the recommendation. About a month later, on May 6,

2

2023, consistent with policy, the advanced care provider submitted a prior authorization request for hyperbaric oxygen therapy to be reviewed by Dr. LaVoie. The request briefly described Boland's medical history and condition and noted that diagnostic testing indicated findings consistent with radiation cystitis. Dkt. No. 60 at ¶¶46-53.

Dr. LaVoie explains that he is familiar with hyperbaric oxygen therapy because he completed 40 hours of hyperbaric oxygen therapy training in 2014 and received the relevant certification. He also provided hyperbaric oxygen therapy at a hospital from 2014 through 2015. Dr. LaVoie states that during his training, it was emphasized that providers should strictly adhere to the Centers for Medicare and Medicaid Services guidelines to determine whether hyperbaric oxygen therapy is appropriate. He further notes that it was emphasized that providers should not use hyperbaric oxygen therapy for any condition that is not approved because providers were getting into trouble for defrauding Medicare by using hyperbaric oxygen therapy only on the basis that it *might* help. Dkt. No. 60 at ¶¶54-58.

Upon receiving the advanced care provider's request, Dr. LaVoie reviewed Boland's electronic medical records to check what symptoms Boland was reporting and to determine whether those symptoms were worsening over time. He learned that Boland was complaining of episodes of bloody urine with mild to moderate pain and that those symptoms did not appear to be progressing at that time. He also checked the list of covered diagnoses from the Centers for Medicare and Medicaid Services to determine whether radiation cystitis had been added as a covered diagnosis in the years since he had completed his training. According to Dr. LaVoie, the condition had not been added as a covered diagnosis. Dr. LaVoie also reviewed Cochrane literature, which reviews clinical studies, rates their strength, does meta-analysis, and summarizes recommendations. Dr. LaVoie explains that he ran a search for "HBOT cystitis" and found one

3

review entitled "Hyperbaric oxygen therapy for late radiation tissue injury," which was first published in 2016. The review found there was some evidence that hyperbaric oxygen therapy improved outcomes of late radiation tissue injury affecting bones and soft tissue of the head and neck, but these improved outcomes were not related to radiation cystitis. He further explains that the conclusion of the review was that hyperbaric oxygen therapy is probably safe, but there was no difference between healing rates, pain improvement, or bleeding between patients receiving hyperbaric oxygen therapy and those under observation. Dr. LaVoie further highlights that the individual studies cited in the literature did not include enough patients to give statistically significant results and were of questionable structure to be valid. Dkt. No. 60 at ¶¶59-71.

Dr. LaVoie explains that, based on his experience and review of the available research, he concluded that although hyperbaric oxygen therapy is a safe option, it is not the standard of care. He also concluded that there is insufficient evidence supporting a finding that hyperbaric oxygen therapy is an effective treatment for radiation cystitis. Accordingly, on May 18, 2023, about two weeks after receiving the advanced care provider's request, Dr. LaVoi denied the recommendation for hyperbaric oxygen therapy to be provided to Boland, noting that the treatment was not indicated for Boland's condition. Dr. LaVoie asserts that he did not follow Boland's medical care after he denied the recommendation. He explains that advanced care providers are responsible for determining their patients' plan of care. Dkt. No. 60 at ¶¶72-74.

Following Dr. LaVoie's denial, Boland continued to have blood in his urine. On August 22, 2023, Boland was seen by Dr. Nelson, who again recommended hyperbaric oxygen therapy to address Boland's complaints. About a month later, Boland submitted a health services request highlighting that Dr. Nelson had again recommended hyperbaric oxygen therapy and inquiring whether he would be receiving the treatment. A nurse responded the next day, on September 27,

2023, and informed Boland that Dr. LaVoie had denied the recommended treatment a few months earlier. Dkt. No. 60 at ¶¶79-83.

In early October 2023, the institution complaint examiner contacted Barker about an inmate complaint Boland had submitted in regards to being denied hyperbaric oxygen therapy as recommended by an offsite specialist. Barker reviewed Boland's chart and informed the institution complaint examiner that a request would have to be placed regarding the specialist's recommendation. Barker explains that she only reviewed Boland's medical records around the time of the specialist's August recommendation, so she did not realize that Dr. LaVoie had denied the same recommendation a few months earlier. Nearly two months later, on November 27, 2023, Boland submitted a health services request addressed to Barker and asked if a decision had been made regarding the specialist's August recommendation. A nurse triaged the request and forwarded it to Boland's advanced care provider, who then informed Boland that Dr. LaVoie had denied the treatment in May. Dkt No. 60 at ¶¶84-93.

A couple of days later, on November 30, 2023, Boland submitted a health services request addressed to Barker asking about the denial of Dr. Nelson's August recommendation for hyperbaric oxygen therapy. Barker responded on December 14, 2023, and confirmed that Dr. LaVoie had denied the same recommendation just a few months earlier. Boland continued to complain about the denial, sending letters to the Bureau of Health Services and submitting another inmate complaint. Barker consistently highlighted that Dr. LaVoie had denied the recommended treatment. Dkt. No. 60 at ¶¶94-106.

On February 20, 2024, Boland was again seen by Dr. Nelson, who again recommended hyperbaric oxygen therapy. On April 10, 2024, Boland was seen by his advanced care provider, who informed him she would consult with Dr. LaVoie and the associate director regarding the

5

specialist's recommendation. In response to the advanced care provider's questions about how she should proceed, Dr. LaVoie confirmed via email that the recommendation had been rejected and instructed her to discuss alternative interventions with the specialist. On June 17, 2024, Boland filed this lawsuit, and the next day, Barker sent a message to Boland's advanced care provider and instructed her to resubmit the request for hyperbaric oxygen therapy. In response, the advanced care provider forwarded Dr. LaVoie's recent email communication to her. Dr. LaVoie confirms that it continues to be his opinion that hyperbaric oxygen therapy is not indicated for radiation cystitis. Moreover, he believes that the specialist's recommendation is a "Hail Mary" to provide Boland with *some* treatment since, unfortunately, there are no good treatment options for radiation cystitis. However, Dr. LaVoie notes that hyperbaric oxygen therapy is very expensive and would require daily travel out of the institution for many weeks. Given the lack of evidence showing that the treatment increases the chance for improvement above watchful waiting, Dr. LaVoie believes that most, if not all, insurance companies would deny coverage for the treatment for the same reasons he denied the recommendation. Dkt. No. 60 at ¶¶107-122.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth

specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Boland asserts that Dr. LaVoie violated the Eighth Amendment when he rejected an offsite specialist's recommendation that he receive hyperbaric oxygen treatment for his radiation cystitis. Boland also asserts that Barker violated the Eighth Amendment when she failed to adequately respond to Boland's inquiries about the denial. To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). The Seventh Circuit has clarified that, "[w]ithin the universe of deliberate indifference cases is a narrower category when a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for that condition." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). These types of cases are "better framed not as deliberate indifference to a serious medical need, but as a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Id.* (cleaned up). It has long been held that, in such cases, courts must "defer to a medical professional's treatment decision 'unless no minimally competent professional would have so responded under those circumstances." *Id.* Importantly, a "disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment is

generally insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (citations omitted).

It is undisputed that Dr. LaVoie did not ignore the specialist's recommendation for hyperbaric oxygen treatment. Rather, based on his experience, specialized training, and research, Dr. LaVoie concluded that there was insufficient evidence showing that the treatment would be effective. Dr. LaVoie explains that he believes the specialist suggested a "Hail Mary" treatment that *might* provide Boland with some relief, but he clarifies that, unfortunately, there are no treatments for Boland's condition that have been proven effective. Dr. LaVoie decided that the expense of the treatment, the disruption to prison operations, and the security concerns associated with transporting Boland out of the institution daily for multiple weeks was not justified given the lack of evidence supporting the treatment's effectiveness. Dr. LaVoie therefore rejected the recommendation.

Boland disagrees with Dr. LaVoie's conclusion, and he highlights that the specialist repeated his recommendation three times, so he obviously also disagrees, but as noted, a disagreement between a prisoner and his doctor or even between two medical professionals about the course of treatment is generally insufficient on its own to establish an Eighth Amendment violation. In order to survive summary judgment, Boland was required to go beyond highlighting the disagreement and provide evidence from which a jury could reasonably conclude that no minimally competent professional would have responded as Dr. LaVoie responded. To be clear, a "disagreement between doctors about a treatment plan does not show a substantial departure from accepted medical judgment unless the disagreement is based on non-medical reasons." *Weightman v. O'Brien*, No. 24-1543, 2025 WL 487214 at *3 (7th Cir. Feb. 13, 2025). Boland

"provides no evidence that [Dr. LaVoie's] decision was based on non-medical reasons, so the medical judgment rule applies." *Id.*

In an attempt to show that Dr. LaVoie's decision substantially departed from accepted medical judgment, Boland first argues that, contrary to Dr. LaVoie's assertion, the Centers for Medicare and Medicaid Services guidelines *do* include radiation cystitis as a covered diagnosis for hyperbaric oxygen therapy. But Boland mischaracterizes the guidelines. The guidelines state only that "soft tissue radionecrosis" is covered by existing Medicare policy. Dkt. No. 43-3 at 4. Boland insists that radiation cystitis is a subcategory of soft tissue radionecrosis, but he offers no evidence to support this assertion. Boland is not a medical provider and has no medical experience or education, so his speculation on the meaning of technical medical terms is insufficient to create a material dispute of fact. Dr. LaVoie explains that, as was the case when he received specialized training in this area, hyperbaric oxygen treatment still is *not* an approved therapy for radiation cystitis, and the guidelines confirm that radiation cystitis does not appear in the list of approved conditions.

Boland next zeros in on a particular study mentioned in the Cochrane literature that Dr. LaVoie reviewed when making his decision. According to Boland, a cited study referred to as "Shao 2011" involved the use of hyperbaric oxygen to treat radiation cystitis and that study showed that patients receiving the treatment reported improvements in their condition. Again, though, Boland is not a medical provider and has no relevant experience from which he can judge how much weight to give to a single study.[1] Dr. LaVoie explains that the conclusion of the review

---

[1] The "Shao 2011" study involved the comparison of intravesical hyaluronic acid instillation and hyperbaric oxygen in the treatment of radiation-induced hemorrhagic cystitis. The study included only twenty participants who received hyperbaric oxygen therapy and sixteen participants who received hyaluronic acid instillation. Improvement rates in both groups were similar. *See* Dkt. No. 35-2 at 18, 25. Boland offers no evidence supporting a conclusion that a single study with a small number of participants offers "statistically significant results," nor does he offer evidence describing the structure of the study. More importantly, as Boland acknowledges, the study did not include

9

suggested that hyperbaric oxygen therapy was probably safe, but there was no difference between healing rates, pain improvement, or bleeding between patients receiving hyperbaric oxygen therapy and patients receiving no treatment. He further clarified that the cited studies were not reliable because they were only case reports without any randomly assigned double blind prospective studies and they did not include enough patients to give a statistically significant result. Dkt. No. 60 at ¶¶69-70.

In short, Dr. LaVoie has provided evidence supporting a conclusion that he exercised his professional judgment when he rejected the recommendation, and Boland has not provided any evidence from which a jury could reasonably conclude that no minimally competent professional would have responded as Dr. LaVoie responded. It should go without saying that a course of treatment requiring costly and possibly dangerous daily travel from a prison would only be approved in narrow instances when the treatment is of obvious efficacy, not when the treatment is questionable or only possibly beneficial. That Dr. LaVoie did not approve it here is hardly surprising. Accordingly, Dr. LaVoie is entitled to summary judgment on Boland's federal claim.

Barker is also entitled to summary judgment. As the health services manager, Barker's role was purely administrative. She was not responsible for making treatment decisions for Boland, nor did she have the authority to override or challenge Dr. LaVoie's rejection of the specialist's recommendation. *See Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (holding that a prison official can be held liable only if she is personally involved in the alleged deprivation). Moreover, the record shows that, when issues were brought to her attention, she followed up with the appropriate providers to ensure Boland's concerns were being addressed. Because nothing in the record suggests that she had reason to believe Boland was receiving inadequate care (as opposed

---

an observation group, so the study offers no insight into how patients receiving hyperbaric oxygen therapy fared compared to patients receiving no treatment, an important factor in a condition that may improve on its own over time.

to not receiving his preferred care), she was "entitled to defer to the professional judgment of the facility's medical officials" on questions of his medical care. *See Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) (citations omitted). Boland's federal claim against Barker must therefore be dismissed.

Finally, because the Court is dismissing Boland's federal claims against Dr. LaVoie and Barker, the Court will relinquish its jurisdiction over Boland's state law claims.[2] *See* 28 U.S.C. §1367(c)(3). Subject to any restraints under state law, Boland may pursue those claims in the appropriate state court.

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motion (Dkt. No. 40) is **GRANTED**. Boland's federal claims are **DISMISSED with prejudice** and his state law claims are **DISMISSED without prejudice**. The clerk of court is directed to enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 5th day of November, 2025.

STEPHEN C. DRIES
United States Magistrate Judge

---

[2] Contrary to Defendants' assertions, Boland was permitted to proceed on a medical malpractice claim against Dr. LaVoie and a negligence claim against Barker. *See* Dkt. No. 23.

This order and the judgment to follow are final.  Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment.  *See* Fed. R. App. P. 3, 4.  This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline.  *See* Fed. R. App. P. 4(a)(5)(A).  If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome.  If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court.  *See* Fed. R. App. P. 24(a)(1).  Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious.  *See* 28 U.S.C. §1915(g).  If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury.  *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b).  Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment.  Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment.  The Court cannot extend these deadlines.  *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.